## WHEELER & Others *v.* NEW BRUNSWICK & CANADA RAILROAD COMPANY.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CONNECTICUT.

Argued April 16, 1885.—Decided May 4, 1885.

A, by letter dated January 31, acknowledged to B, Vice-President of C, a Corporation, that he had bought of him as representative of C, one thousand tons of old rails for delivery before August 1, and also two to six hundred tons for delivery between August 1 and October 1. B, by letter of same date, signed in the corporate name, B, Vice-President, accepted the order, and agreed to deliver the rails. On the 17th February B wrote A, enclosing a corporate ratification of the sale which stated the ton as " per ton of 2,000 pounds." A replied February 23 that he understood at the time of the sale, and still understood the sale to be "absolute, final, unconditional," needing no ratification, and that the number of pounds in each ton under the contract " was not 2,000 but 2,240." C made no answer before June 14, when it notified A that it had 1,000 tons old rails ready for delivery, and that without waiving its rights under the contract, to avoid dispute it made the tender, "at gross weight of 2,240 lbs. to the ton." A replied that he did "not recognize the existence of any such contract of sale," and declined to designate a place for delivery. The court below found that B had authority to make the contract, and that each party at the time of its making understood the word "ton" to mean a ton of 2,240 pounds. On these facts, *Held,* (1) That there was a legal contract between the parties ; (2) That C was not estopped from setting it up against A ; (3) That the contract was not repudiated and terminated by C in such manner as to discharge A from further obligation ; (4) That A was bound to accept from C, between August 1 and October 1, any amount of rails between the limits of two hundred tons and six hundred tons.

This was an action at law brought by defendant in error, as plaintiff below, to recover damages of plaintiffs in error, for refusal to receive a quantity of old rails under a contract. The facts which make the case are stated in the opinion of the court.

*Mr. J. K. Beach* and *Mr. E. J. Phelps* for plaintiffs in error.

*Mr. John W. Alling* and *Mr. C. R. Ingersoll* for defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

The case was submitted to the court without a jury, and the question to be decided here is, whether on the finding of facts the judgment for plaintiff below is right.

The action was brought by the railroad company on the following agreement:

"NEW HAVEN, *Jan'y* 31, 1880.

JAMES MURCHIE, ESQ.,
    *V. Pres't N. Brunswick & Canada R. R.*

DEAR SIR: We have this day bought of you, as representative of the New Brunswick & Canada R. R. Co., one thousand tons old rails, for delivery in New York or New Haven (at our option), at $30, without duty, and delivery to be before Aug. 1st; and also two (2) to six hundred tons, for delivery in New York or New Haven, between August 1st and October 1st, at $28, without duty. Terms in each case cash ag'st B. L. and insurance policy in satisfactory company.

    Very resp'y,        E. S. WHEELER & CO."

"NEW HAVEN, *Jan'y* 31, '80.

S. WHEELER & Co., *New Haven.*

We hereby accept your order of this date, and will deliver rails at place and on terms named.        Resp.

    NEW BRUNSWICK & CANADA R. R. CO.,
        JAMES MURCHIE, *V. Pres't.*"

There was a tender of the rails by the railroad company, and a refusal to receive or pay for them by Wheeler & Co.

The court finds as a matter of fact that the contract was a valid contract, and that Murchie had authority to make it on behalf of the company. The controversy in the case grows out of the following correspondence subsequent to the making of the contract by the execution and delivery of the foregoing papers:

"ST. STEPHEN, *Feb.* 17*th*, 1880.

MESS. E. S. WHEELER & Co., *New Haven.*

Dear Sirs: I herewith enclose a copy of resolution passed at our meeting of directors yesterday.

This confirmed the sale 'made by me to you' by the company, which was done on my arrival home.

The car-wheels and chains that we had on hand were sold before I came home. We will have a large quantity by the time we ship our rails.

Please acknowledge the above.

Yours, truly,   JAMES MURCHIE.

*New Brunswick & Canada Railroad Company.*

Minute of a resolution passed at a directors' meeting February 16, 1880.

*Resolved,* That the following sale of old rails, made by Mr. James Murchie to Messrs. E. S. Wheeler & Co., New Haven, Conn., be confirmed: Sold Messrs. E. S. Wheeler & Co. one thousand tons of old rails, for delivery in New York or New Haven, at their option, before August the 1st next, at thirty dollars ($30) per ton of 2,000 lbs., the duty to be paid by Wheeler & Co., and also two hundred to six hundred tons, for delivery in New York or New Haven between August 1st and October 1st, at twenty-eight ($28) per ton of 2,000 lbs., the duty to be paid by Wheeler & Co. In each case cash against invoice bill of lading. Insurance policy in satisfactory company.

True copy:   F. H. TODD, *Pres.*"

"NEW HAVEN, *Feb.* 28, 1880.

JAMES MURCHIE, ESQ., *Vice Pres't New Brunswick &*
*Canada R. R. Co., St. Stephens, Canada.*

DEAR SIR: We received duly your favor of the 17th inst., enclosing what purports to be a certified copy of a resolution adopted by the directors of the N. B. & C. R. R. Co. in reference to the sale of old rails made by you on behalf of that company to us on the 31st ult. We assume that this resolution was passed merely as a matter of form, and a copy has been sent to us for our information solely, as no mention was made at the time of the negotiations that you acted subject to any approval by your company. We understood then, and understand now, that the sale made at that time on behalf of your company was

an absolute and final unconditional sale. We do not understand, further, that this resolution was forwarded to us with the view of in any way modifying that sale in any of its terms.

Furthermore, we understood at the time, and now understand, that the number of pounds in each ton of this contract, there being no contrary specification when the contract was made, was not 2,000 but 2,240. Old rails, like other scrap and like pig-iron, are bought and sold by the gross ton, not only in this market but in every foreign market. The custom of the trade fixing 2,240 as the standard number of pounds in a ton of old rails is universal, and can be excluded from operating on contracts only by distinct conditions fixing some other quantity. No such conditions were mentioned in the contract of your company with us, and we look, therefore, for the delivery of the rails within the dates named in the contract of your company, and in 'gross' not 'net' tons. We make no doubt but that your understanding of that contract is in accord with ours, and that in so far as this resolution fixes a different number of pounds for each ton, that it so fixes them by an oversight on the part of the directors. We hope to hear from you at your early convenience.

Very truly yours,          E. S. WHEELER."

No answer was made to this letter, nor was any further correspondence had until June 14, when the railroad company notified Wheeler & Co. by letter that they had the 1,000 tons of old rails ready for delivery, and added—

"In your letter to James Murchie, as vice-president of our company, of February 28, last, you construe the contract as meaning that the ton of rails specified in that contract is 2,240 lbs., or the gross ton; now, without waiving any of our rights under that contract, but to avoid dispute, we tender you the delivery of the thousand tons at gross weight of 2,240 lbs. to the ton, and ask your determination whether the delivery shall be made at New Haven or New York.

NEW BRUNSWICK & CANADA RAILROAD Co.

By F. A. PIKE, *Special Agent.*"

To which reply was made by the plaintiffs in error as follows:

"NEW HAVEN, *June* 15, 1880.

NEW BRUNSWICK & CANADA RAILROAD CO.

GENTLEMEN: Your letter of yesterday, advising us that you are ready to deliver to us 1,000 tons of old rails, and asking us to designate a port of delivery, is received.

As we do not recognize the existence of any such contract of sale as your letter contemplates, we have no instructions to offer upon the subject.

It is true that we tried last winter to buy of you 1,000 gross tons of old rails at a price which would have netted us a large profit; but this we had to lose, as your company insisted that they were selling net tons, and no contract resulted upon which we could base our sales.

Very truly yours,   E. S. WHEELER & Co."

A similar correspondence took place between the parties in August, in reference to the six hundred tons tendered by the railroad company under the clause of the contract for two to six hundred tons to be delivered in that month.

The court finds as a fact that each of the parties, at the time the contract was made, understood that the word tons meant tons of 2,240 pounds, and there was no misunderstanding between said persons (Wheeler and Murchie) as to the true intent and meaning of the contract. The court also finds that Murchie was duly authorized to make the contract on behalf of his company, and it rendered judgment for the plaintiff.

1. It is assigned for error that no legal contract between the parties to the action was established.

2. That, if any contract existed at any time, the defendant in error was estopped from setting it up as against the plaintiffs in error by the pleadings and by the facts proved.

3. If such contract existed, it was repudiated and terminated by the defendant in error in such manner as to discharge the plaintiffs in error from further obligation.

4. Damages were more than plaintiff was entitled to recover.

As regards the first of these propositions, it is sufficient to

say that the Circuit Court finds as a fact that there was a contract made. It also finds other facts which establish that proposition beyond controversy, namely, that Murchie and Wheeler, who signed and delivered the papers which constituted the written agreement, had authority to do so and to bind the parties to their action. The agreement, on its face, makes a contract. The court finds that there was no mistake or misunderstanding between Wheeler and Murchie as to the number of pounds which the ton should contain.

It is, therefore, to be taken, as the foundation of the whole case, that when these papers were signed and delivered at New Haven, January 31, a valid and completed contract, the one on which the suit was brought, existed between the parties to the suit.

The second and third grounds of error may be considered together. What was done by the railroad company which repudiated and terminated the contract and discharged Wheeler & Co. from its obligation, or estopped the railroad company from setting it up against them?

It is to be observed that to annul or set aside this contract, fairly made, requires the consent of both parties to it, as it did to make it. There must have been the same meeting of minds, the same agreement to modify or abandon it, that was necessary to make it. All that was said or done, on which reliance is placed, for that purpose, is in the two letters, one written seventeen days after the contract was completed and the other twenty-eight days afterwards.

The first of these, that of Murchie to Wheeler & Co., enclosing the resolutions of the directors of the railroad company, so far from repudiating the contract or denying its force and validity, by this resolution, in express terms, affirms it. Though the contract needed no ratification to make it binding, the company here ratifies what its vice-president had done. In doing this, it thought proper to place its own construction on the word "ton," as used in the contract; but neither in the resolution of the directors nor in the letter of Mr. Murchie is there the slightest intimation that a difference of opinion on this matter would be relied on as impairing the obligation of

the contract. If they believed that their construction was the right one, it was the simplest piece of justice and precaution to suggest it, leaving the question, as by law it must be left, to a court to construe, if the difference was insisted on by either party. Finding that Wheeler & Co. did not concur in this construction, the railroad company waived their view of it, and tendered performance in accordance with the view of the other party.

Looking now to what was said by Wheeler & Co. in reply to this, it is still clearer that they did not entertain for a moment the idea of an abandonment or rescission of the contract; but, on the contrary, that they insisted on its continued existence and on performance of it according to their understanding of its meaning. After stating that they did not understand that the contract needed the ratification of the company to make it valid, they say: "We understood then, and understand now, that the sale made at that time on behalf of your company was an absolute, and final, unconditional sale. We do not understand, further, that this resolution was forwarded to us with the view of in any way modifying that sale in any of its terms." Certainly this was a fair construction of the resolution. Then, after commenting on the commercial meaning of the word "tons," which could only be varied by express conditions in the contract, they say: "No such conditions were mentioned in the contract of your company with us, *and we look, therefore, for the delivery of the rails within the dates named in the contract of your company,* and in 'gross' not 'net' tons."

They then add their belief that Murchie, to whom the letter was addressed, understood the contract as Wheeler did as to the number of pounds to the ton.

The correspondence ceased here until the time for delivery of the rails arrived. Nothing more was said or done by either party during this time. The last word from each to the other was a clear assertion of the existence of a valid contract, and the very last words of the correspondence was the assertion of Wheeler & Co. that "we look for the delivery of the rails within the dates named in the contract." When, therefore, on

the 14th of June, the railroad company notified Wheeler & Co. that they were ready to comply with the contract by delivering tons of 2,240 pounds, and requested to know whether it should be made at New York or New Haven, they must have been surprised by the letter of Wheeler & Co., denying the existence of the contract, and treating the matter as a negotiation from which no contract resulted. The contrast between this and their last letter of February 28th is indeed remarkable.

By this letter of June 14th Wheeler & Co. do not place their refusal to receive on the ground now set up by counsel, namely, that though a contract was made, it had been waived or abandoned by the parties, or by the railroad company, or that the company was estopped from enforcing it; but on the broad ground that the negotiations for the sale and purchase of the iron had failed, and had never become a contract because of the disagreement as to the difference between net and gross tons.

As there *was* a contract, as neither party had abandoned it, or expressed any purpose to do so, Wheeler & Co. were bound to accept and pay for the rails when tendered, unless they have some other good reason for not doing so.

It is said such reason is to be found in the silence of the railroad company after the receipt of the letter of Wheeler & Co. to Murchie of the 28th of February, by which the railroad company is estopped from enforcing the contract. It would be difficult to make out such an estoppel from mere silence, since nothing remained to be done by either party until the time for performance came. If the letter of Wheeler & Co. had expressed any doubt of the binding force of the contract, or had made any proposal for its modification, or had suggested a willingness to reconsider the question of weight of the tons, there might be some reason why the railroad company should have responded, and why a failure to respond might be some small evidence of want of good faith.

But these letters show a determination on both sides to insist on their rights under the contract, and Wheeler & Co.'s letter left no answer to be made unless the other party should yield its construction of the contract. It was not bound to do

this.   It had a right to insist on the contract, and to refer its performance of it to the courts in case it became necessary. The railroad company could, when the time for delivery of the rails came, deliver the one thousand tons by either standard. If the other party accepted there was an end of the matter. If it did not, it could accept *pro tanto*, and sue for the balance, or it could refuse to accept at all.   But in all this the contract would remain, and would be the measure of the rights of the parties in court or out of it.

There was, therefore, no necessity for the railroad company to reply to the letter of Wheeler & Co.   It was not bound to say any more than it had said as to the true meaning of the contract. There was no demand in the letter of Wheeler & Co. that the railroad company should accept its construction. There was no intimation that if this was not done the contract was at an end, or would be abandoned.

Let us suppose that the price of iron had risen instead of declining during this three or four months, and the railroad company had failed to deliver, would Wheeler & Co. have lost their right of action by anything in their letters, or by the cessation of the correspondence?   Clearly not.   And yet, if that correspondence released one party, it must have released both. There remained no obligation, unless it was mutual.   The right to deliver and require payment, and the right to require delivery, were correlative rights, one of which could not exist without the other.

The judgment of the court that plaintiff was entitled to recover is right.

The objection to the amount of the recovery rests upon the contention of defendants that they were only bound by the contract for the October delivery to accept two hundred tons, while the court held them bound for the difference in price for six hundred tons.

We concur with the Circuit Court in holding that when Wheeler & Co. say we have bought of you (the railroad company) "from two (2) to six hundred tons for delivery in New York or New Haven between August 1st and October 1st" that they agreed to accept any amount of old rails between

those limits. The company was selling old rails. It knew that by August it would have a thousand tons. It did not know how much more they would have by October 1. It intended to secure the sale of what it might have, between two hundred and six hundred tons.

Besides, as it was bound to do the first act in performance of the contract by delivering the iron, the option, if there was one, was with the railroad company. The defendants were never in condition to exercise this option, if one existed. *Townsend* v. *Wells*, 3 Day, 327 ; *Patchin* v. *Swift*, 21 Vermont, 292 ; *M'Nitt* v. *Clark*, 7 Johns. 465.

The judgment of the Circuit Court is            *Affirmed.*

MR. JUSTICE BLATCHFORD, with whom concurred MR. JUSTICE FIELD, MR. JUSTICE HARLAN, and MR. JUSTICE MATTHEWS, dissenting.

Justices FIELD, HARLAN, MATTHEWS and myself are unable to concur in the judgment of the court in this case. When the directors of the Railroad Company came to consider, as a Board, the transaction between Murchie and Wheeler & Co., they took it up, as their resolution states, as a sale by Murchie to Wheeler & Co., and confirmed it on behalf of the Railroad Company, as a sale of tons of 2,000 lbs. When Wheeler & Co. received Murchie's letter enclosing a copy of the resolution of the Board, their letter of reply of February 28, 1880, states their understanding to be, that the sale was not made subject to approval by the Railroad Company, and that the ton was 2,240 lbs., and that they look for the delivery of the rails in gross and not net tons. But the resolution of the Board expressed the contrary view, as to the ton; and so the letter proceeds to say, that Wheeler & Co. make no doubt that Murchie's understanding of the contract, as he had made it, is in accord with that of Wheeler & Co., and that, in so far as the resolution of the Board fixed 2,000 pounds for each ton, it did so by an oversight on the part of the directors. This was a plain appeal to Murchie, to bring his understanding of the contract to bear on the directors, to induce them to change their view and their statement of the contract, in respect of

the tons; and it was followed up by the closing words of the letter : "We hope to hear from you at your earliest convenience." The whole tenor of this letter was to throw the matter into the field of negotiation and arrangement, where the Railroad Company asked to have it put. That Company plainly said to Wheeler & Co.: "If you regard the ton in this contract as a gross ton, we do not; and, if you do, we do not think there is any contract." Wheeler & Co. replied: "We do, and we think such was Mr. Murchie's view at the time, and that your directors have committed an oversight in their resolution which 'fixes' the ton at 2,000 pounds; but, in view of all this, we ask to hear from you at your early convenience about it." At that date old rails were $33.50 to $34 a ton of 2,240 pounds, without duty. The contract price was $30 and $28, without duty. The contract was a good one for Wheeler & Co., if they could then sell the rails, for future delivery, at the market rate of that date, and if the tons of the contract were 2,240 pounds. So, it was important for them to know whether the Railroad Company would adhere to the view stated in the resolution or would recede from it; and they sought to learn. But they received no reply from Murchie or his Company. They had a right to take the Company at its word and to act on its solemnly announced understanding of the contract. They did so and refrained from turning the contract to any benefit by a re-sale of the rails. They were dealers in rails and bought only to re-sell. They did not buy to use otherwise. This the Railroad Company and Murchie knew.

Now, what is the finding of the Circuit Court? It is, that Murchie in fact understood that the tons of the contract were 2,240 pounds, as did Wheeler & Co.; that the Company, while not misunderstanding, intended to induce Wheeler & Co. to think it misunderstood, for the purpose of having Wheeler & Co. agree that the tons should be 2,000 pounds; that this conduct was "disingenuous;" and that the natural effect of a failure to reply to Wheeler & Co.'s letter was to create "great uncertainty" on the part of Wheeler & Co., and to cause "annoyance and pecuniary loss" to them. On these facts, it is held,

that, when the market price of the rails has fallen to one-half of the contract price, the Company can insist on compelling Wheeler & Co. to take the rails at the contract price, because the Company then chooses to turn around and say : " The ton was and is 2,240 pounds. We were wrong all the time, and you were right; and we now reply to your letter, by saying that we did commit an ' oversight' in our resolution, as you suggested."

We can sanction no such view of the rights of the parties to a commercial transaction. The company made statements, in its resolution and letter, which the Circuit Court finds were not true, as to its understanding regarding the ton ; and which that court finds it knew were not true; and which that court finds it intended should be regarded by Wheeler & Co. as honestly made; and which it is clear it intended Wheeler & Co, should act upon; and which they did act upon to their injury. The actual ground of recovery by the company in this case is based on proof of the untruth of the assertions made by the company, followed by the proposition that Wheeler & Co. had no right to believe and rely on those assertions. Every element exists to estop the company from denying the truth of those assertions, and from insisting that Wheeler & Co. should not have relied on them. There is not a suggestion impeaching the good faith and fair dealing of Wheeler & Co. They were not guilty of any deceit or misrepresentation; they held out no false light ; they did not attempt to procure an advantage by an untrue statement of their understanding of the contract.; they did not mislead the other party to his injury. Their letter to Murchie of February 28 was a model of mercantile candor and fair dealing. It demanded a reply. The absence of a reply was no ground for supposing that the company had abandoned the position it took in the resolution, for Wheeler & Co. did not then know, what they learned afterwards, that the resolution was a sham and a false pretence.

The conclusion seems to us to follow inevitably, under the findings of the Circuit Court, that the company had lost its right to recover on the contract; and we, therefore, dissent from the judgment of affirmance.